A01A0066. PATRICK v. MACON HOUSING AUTHORITY et al.
A01A0067. MACON HOUSING AUTHORITY v. PATRICK.
(552 SE2d 455)

ANDREWS, Presiding Judge.

Wanda Patrick slipped and fell in a puddle of water in a common area of an apartment building owned and operated by the Macon Housing Authority. She brought two suits seeking to recover for injuries she suffered in the fall: a premises liability claim against the Authority pursuant to OCGA § 51-3-1 claiming it failed to keep the common area safe for invitees, and a claim based on the principle of respondeat superior against Justice Home Care, Inc. claiming its employee negligently left the water on the floor. The appeal in Case No. A01A0066 is from the trial court's grant of summary judgment for Justice Home Care. We affirm the trial court in this case because

---

[12] *Rivergate Corp. v. Atlanta Indoor Advertising Concepts*, 210 Ga. App. 501, 504 (4) (436 SE2d 697) (1993).

Patrick's claim was based on sheer speculation that Justice Home Care's employee left the water which caused the slip and fall. The appeal in Case No. A01A0067 is from the trial court's denial of the Authority's motion for summary judgment. We reverse the trial court in this case because we find as a matter of law that the Authority exercised reasonable care pursuant to OCGA § 51-3-1 to inspect and keep safe the common area of the building.

### Case No. A01A0066

At the time of the slip and fall, Patrick was working as an aide for Crossroads Home Service, a personal care provider, and was about to do laundry for an elderly client who lived in the Authority's apartment building. Patrick took two steps into the third-floor common area laundry room and slipped and fell in a puddle of water on the floor. Gussie Mae Fleming, who worked as an aide for Justice Home Care, another personal care provider, was also doing laundry in the same laundry room for one of her clients. Fleming had just finished taking clothes out of a washer and putting them into a dryer and was leaving the laundry room when she saw Patrick about to enter the room. As Fleming left the room, she did not see or hear Patrick slip and fall.

At her deposition, Fleming was asked if it was possible she put water on the floor when she transferred clothes from the washer to the dryer by shaking the clothes to straighten them before putting them in the dryer. She responded that she commonly shook clothes to get any knots out before putting them into the dryer, but added that, when she did so, the clothes were not dripping wet but only damp. She could not ever remember water dripping from clothes when she shook them and testified that she saw no water on the floor of the laundry room from the time she entered the room until she left after putting the clothes in the dryer.

At best, this evidence shows only a possibility that Fleming might have shaken a few drops of water from damp clothes, but there is no evidence of it. It might also support speculation that, if some drops were shaken to the floor, they might have formed the puddle of water in which Patrick slipped and fell, but there is no evidence this happened.

Patrick further suggests there was evidence raising a reasonable inference that Fleming negligently spilled water on the floor while attempting to add water to one of the washers. This contention is based on evidence that, after the slip and fall, one of Patrick's elderly clients, Minnie Etheridge, spoke to a woman who worked as an aide at the building and who admitted to her that she spilled water on the floor of the laundry room while pouring it into a washer.

Etheridge testified that, when she learned Patrick slipped and fell while doing her laundry, she immediately went to look at the laundry room with Patrick. She said a woman was in the laundry room when she and Patrick arrived, and this woman told her that she had spilled water on the floor when she tried to pour extra water into the washer she was using. Etheridge said the woman was "an aide for some company," wearing a pink top and a white skirt, but she did not know which company. She variously described the woman as "average size[d]" and "big and fat." Etheridge, who admitted that her eyesight was failing, was not sure of the woman's height, weight, or race, or whether she could identify the woman if she saw her again.

There was no evidence in the record showing what Fleming was wearing on the day of the slip and fall, nor any other evidence showing she fit a description given by Etheridge. Evidence showed that other residents of the building also had aides who provided personal care services. The record shows no effort was made to have Etheridge identify Fleming as the woman she saw in the laundry room after the slip and fall. No reasonable inference can be drawn from this evidence that Fleming was the woman who told Etheridge she spilled the water.

Moreover, other evidence in the record supports the reasonable inference that Fleming was not the woman who told Etheridge she spilled the water. Patrick testified that, after she fell, she immediately walked to the nearby elevator, asked a person on the elevator to tell Etheridge that she had fallen, and that Etheridge immediately came down to the third floor to meet her. Etheridge testified that she and Patrick went to the third-floor laundry room together and that the woman she spoke to was in the room.

Patrick testified that, as she was entering the laundry room just before she slipped and fell, she passed a woman coming out of the laundry room whom she recognized but did not know by name. This testimony was consistent with Fleming's testimony that, as she was exiting the laundry room, she passed Patrick entering the room, and that, when she returned to get clothes out of the dryer, she learned from a janitor that Patrick slipped and fell when she entered the room.

These facts support the conclusion that Patrick saw and recognized Fleming just prior to the slip and fall. If Fleming was the woman in the laundry room who admitted in the presence of Etheridge and Patrick that she spilled the water, surely Patrick would have recognized and identified her. However, Patrick made no such identification and said she never spoke to Fleming about the slip and fall. The only reasonable inference is that the woman Patrick and Etheridge saw, and who admitted spilling the water, was not Fleming.

In fact, Patrick testified that she had only heard rumors that a woman who worked in the building spilled the water on the floor, and that Retha Jones, the resident services coordinator at the apartment building, mentioned Fleming's name in connection with finding out who spilled the water. Jones testified, however, that she had only heard rumors that Fleming spilled the water on the floor. Fleming denied that she poured water into a washer or spilled water onto the floor of the laundry room, and she denied having any conversation with Etheridge in which she admitted doing so. Furthermore, Fleming testified that she knew Etheridge and spoke to her occasionally, but she did not remember seeing her on the day of the slip and fall.

No reasonable inference can be drawn from the above facts that Fleming was the woman who admitted spilling the water. To the contrary, the only reasonable inference which can be drawn from the facts is that Fleming was not the woman who spilled the water. It follows that pure speculation was the only basis for Patrick's claim that Justice Home Care's employee, Fleming, negligently left the water on the laundry room floor which caused Patrick to slip and fall.

Only reasonable inferences can give rise to a genuine issue of fact sufficient to preclude summary judgment. *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (405 SE2d 474) (1991). An inference based on mere possibility, conjecture, or speculation is not a reasonable inference sufficient to establish a genuine issue of fact and preclude summary judgment. *Pafford v. Biomet*, 264 Ga. 540, 544 (448 SE2d 347) (1994); *Butler v. Huckabee*, 209 Ga. App. 761, 762 (434 SE2d 576) (1993). Where a plaintiff's proof of causation in a negligence case is based on mere possibilities, or the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it is the duty of the trial court to grant summary judgment for the defendant. *Futch v. Super Discount Markets*, 241 Ga. App. 479, 482 (526 SE2d 401) (1999). Accordingly, the trial court correctly granted summary judgment in favor of Justice Home Care.

### Case No. A01A0067

In this premises liability case, the Macon Housing Authority cross-appeals from the trial court's denial of its motion for summary judgment on Patrick's claim that the Authority failed to exercise ordinary care under OCGA § 51-3-1 to keep the common area of its apartment building safe for invitees.

Because Patrick's slip and fall occurred in the third-floor laundry room, a common area of the apartment building over which the Authority retained control, the Authority was obligated under OCGA § 51-3-1 to exercise ordinary care to keep this area safe for tenants and for Patrick, who was invited by a tenant to perform work for the

tenant in this area. *Lidster v. Jones*, 176 Ga. App. 392, 393 (336 SE2d 287) (1985); *Hohnerlein v. Thomas*, 186 Ga. App. 282-283 (367 SE2d 95) (1988). In order for Patrick to prevail on her slip and fall claim against the Authority under OCGA § 51-3-1, she had to prove two essential elements: (1) that the Authority had actual or constructive knowledge of the puddle of water which caused her slip and fall; and (2) that she lacked knowledge of the puddle despite the exercise of ordinary care. *Robinson v. Kroger Co.*, 268 Ga. 735, 748-749 (493 SE2d 403) (1997). Under *Robinson*, a jury issue existed as to the second essential element concerning Patrick's knowledge of the puddle and the exercise of ordinary care for her own safety. Accordingly, this case concerns the first essential element of the claim — whether the Authority had actual or constructive knowledge of the puddle of water prior to the slip and fall. There is no claim in this case and no evidence showing that the Authority had actual knowledge of the puddle of water prior to Patrick's slip and fall. Thus, the issue presented in this case is whether there was sufficient evidence to create a genuine issue of fact for a jury on Patrick's claim that the Authority had constructive knowledge of the puddle.

In the absence of evidence that the Authority had actual knowledge of the hazard, Patrick could prove the Authority had constructive knowledge by two methods: (1) proof that an employee of the Authority was in the immediate area of the puddle and could have easily seen and removed it prior to the slip and fall; or (2) proof that the puddle had been on the floor of the laundry room for a sufficient length of time that the Authority should have discovered and removed it during a reasonable inspection. *Alterman Foods v. Ligon*, 246 Ga. 620, 622-623 (272 SE2d 327) (1980); *Banks v. Colonial Stores*, 117 Ga. App. 581, 584-585 (161 SE2d 366) (1968). Because there was no evidence (and no claim by Patrick) that an Authority employee was in a position to see and remove the puddle prior to the slip and fall, this case necessarily involves the second method of proving constructive knowledge.

Under this method, Patrick was required to produce facts showing the puddle at issue was on the floor for a sufficient length of time prior to the slip and fall so that knowledge of the puddle would be imputed to the Authority. *Alterman Foods*, 246 Ga. at 622-623. In other words, since the Authority is permitted a reasonable amount of time to exercise ordinary care to inspect the common areas of the building and maintain them in a safe condition, proof of the length of time the puddle existed is necessary to determine whether the Authority was afforded a reasonable time within which to inspect and remove the puddle. *Kroger Co. v. Brooks*, 231 Ga. App. 650, 654 (500 SE2d 391) (1998); *Alterman Foods*, 246 Ga. at 622.

In the present case, Patrick could not say how long the puddle

had been on the floor before she slipped and fell. Nevertheless, this Court has held that a premises liability defendant in a slip and fall case cannot obtain summary judgment on the issue of constructive knowledge by relying on the absence of evidence proving that the hazard had been on the floor long enough to be discovered by a reasonable inspection. *Straughter v. J. H. Harvey Co.*, 232 Ga. App. 29, 30 (500 SE2d 353) (1998); *J. H. Harvey Co. v. Reddick*, 240 Ga. App. 466, 470 (522 SE2d 749) (1999). Under the holding in these cases, Patrick was not required to prove how long the puddle was on the floor unless the Authority first produced evidence to negate Patrick's claim by showing it had reasonable inspection procedures in place and followed them at the time of the incident. *Straughter*, 232 Ga. App. at 30; *Reddick*, 240 Ga. App. at 470; compare *Lau's Corp.*, 261 Ga. at 491, 495.

In this case, the Authority produced evidence that it adhered to an inspection procedure in which the laundry room at issue was inspected every two hours, and that the floor in the laundry room had been inspected for trash and water about an hour or an hour and a half prior to the slip and fall. The issue is whether inspection every two hours was reasonable under the circumstances, or whether there were conditions on the premises that required the Authority to conduct more frequent inspections to keep the common area laundry room safe.

Aside from the present slip and fall, there is no evidence that any aide, or any elderly resident of the building, or any other person had ever slipped and fallen in any common area of the building, including the laundry rooms. Patrick testified that she had been working as an aide for Etheridge five days a week for four years and, during that period of time, she had never seen any water or other liquid on the floor of the laundry room prior to her slip and fall. She said she had never heard of any other slip and fall. Jones, the resident services coordinator at the building, testified there had never been a previous slip and fall.

Moreover, not a single witness testified to any problem with water on the floor of the laundry rooms. Fleming testified that, although she had heard talk from residents about people pouring extra water into washers, she had never seen it done, nor did she have any knowledge that water had ever been spilled on the floor of a laundry room.

Henderson Reeves, who was the maintenance foreman at the apartment building and had been working there for nine years at the time of the slip and fall, testified that, after the slip and fall, he turned off the water to the sinks in the laundry rooms and posted a notice not to add water to the washers. He did this as a precaution against the possibility that residents might spill water while adding

it to a washer, but he had never seen anyone add or spill water. He said mops were put in the laundry rooms, not because of a problem with water on the floor, but as a precautionary measure so that residents could use them if any water got on the floor.

Jones further testified that, prior to the slip and fall, she had heard rumors of residents transferring water from a sink to a washer. However, she had no knowledge that water had ever been spilled on the floor and testified that, prior to the slip and fall, there had been no problems with water on the floor of the laundry rooms.

Clyde Ware, the maintenance mechanic at the apartment building who had been working there for 13 years at the time of the slip and fall, said he also had heard rumors of residents adding water to washers, but he had never seen it done and did not know whether the rumors were true or not. He confirmed that water to the sinks was cut off as a precaution against residents adding water. He testified that, although the laundry rooms had a drain in the middle of the floor in the event water collected, he could not ever recall finding water on the floor of the rooms.

There is no evidence in the record of any dangerous conditions in the laundry rooms caused by the presence of water on the floor. In fact, other than Etheridge's testimony that an unidentified woman told her she spilled the water that caused Patrick's slip and fall, there is no evidence that water had ever been spilled on the floor of a laundry room. Moreover, there is no evidence that anyone had slipped and fallen in a laundry room or anywhere else in a common area of the apartment building prior to Patrick. Accordingly, there is nothing in the record to justify imposing a duty on the Authority to inspect the laundry rooms more often than once every two hours.

The circumstances here are different from those in supermarkets or fast food restaurants where the nature of the business creates conditions which cause slip and falls to occur with some frequency. Under those circumstances, we have held that premises owners have a duty to inspect with greater frequency. *Alterman Foods*, 246 Ga. at 623; *Shepard v. Winn Dixie Stores*, 241 Ga. App. 746, 748-749 (527 SE2d 36) (2000). Rather, this case involves a common area of an apartment building where a slip and fall had never previously occurred, and the Authority had no reason to believe there were any dangerous conditions in the area that could cause a slip and fall. The Authority had no duty to insure the safety of every invitee against injury, nor did it have any duty to constantly inspect the floors in the absence of unusually dangerous conditions. *Winn-Dixie Stores v. Hardy*, 138 Ga. App. 342, 344 (226 SE2d 142) (1976). The law requires only the exercise of such diligence in making the premises safe as an ordinarily prudent proprietor would be accustomed to use

under the circumstances. *Emory Univ. v. Williams*, 127 Ga. App. 881, 885 (195 SE2d 464) (1973).

On the present facts, we conclude as a matter of law that the Authority exercised the ordinary care required under OCGA § 51-3-1 to keep the common areas safe by inspecting every two hours. Having conducted a reasonable inspection under the circumstances, no constructive knowledge of the puddle may be imputed, and the Authority was entitled to summary judgment.

*Judgment affirmed in Case No. A01A0066. Judgment reversed in Case No. A01A0067. Johnson, P. J., Smith, P. J., Ruffin and Ellington, JJ., concur. Eldridge and Miller, JJ., dissent.*

ELDRIDGE, Judge, dissenting.

Wanda Patrick was injured when she entered the third-floor laundry room and slipped on water allegedly left on the floor by Gussie Fleming, an employee of Justice Home Care. The trial court granted Justice Home Care's motion for summary judgment because it ruled that there was no evidence Fleming caused the water to be on the floor. From the evidence in the record, Fleming, by her own testimony, took wet clothing from the washer, shook it out over the floor, and put it into an adjoining dryer; thus, the favorable inference arose that such conduct caused water to drip onto the floor from the wet clothes being shaken and moved, since Fleming was unable to testify that she saw no water on the floor. Further, Fleming denied causing water to be on the floor, and Minnie Etheridge testified that a woman fitting Fleming's description admitted spilling water on the floor 25 minutes after the fall, which constitutes a prior inconsistent statement.

Plaintiff contends that the Macon Housing Authority was either negligent in failing to timely inspect and remove the water, or caused the puddle to occur. The Authority maintained new washers that it knew the users believed only partially filled with water and that many users mistakenly added more water by hand to fill the washer with water to wash a full load; the Authority attempted to stop such practice, but it negligently failed to stop such dangerous practice or to avoid the danger of water on the floor through remedial means. Therefore, its negligence concurred in the alleged negligence of Fleming in spilling the water, which was reasonably foreseeable and required more frequent inspections under the circumstances, as well as corrective measures.

### Case No. A01A0066

On April 24, 1997, plaintiff, while acting as a nurse for Crossroads Home Service and caring for Etheridge, a resident of McAfee

Towers, a retirement center, entered the third-floor laundry room, carrying a basket of Etheridge's clothes to wash. When she entered the laundry room, she did not see water on the floor near the entrance and slipped and fell in a puddle of water just inside the laundry room door.

Fleming, after washing the laundry for Ms. Lewis, a resident, left the laundry room immediately prior to plaintiff's entry and passed plaintiff. Fleming took Lewis' wet clothes out of the top loading washer, shook them out over the floor, and threw the wet clothes into the dryer. Fleming did not notice if water dripped on the floor and denied seeing water on the floor and causing water to get on the floor. She returned to the laundry room 20 to 25 minutes later, after the plaintiff's fall. Although she fit the description of the woman who told Etheridge that she spilled water on the floor, she denied taking water to fill up the washer and spilling the water as she poured it into the washer.

When the plaintiff returned to Etheridge's apartment after her fall and told Etheridge about slipping on water, Etheridge went immediately to the laundry room where she saw water on the floor, found a woman who fit Fleming's description, and asked her if she caused the water to be on the floor. This woman told Etheridge: "Yes I did. I ain't going to lie," and stated that she had gotten the water: "I went down the hall and borrowed it, a pitcher, and got me some; I missed the top and it went on the floor." Etheridge testified to the description of this woman, and it fit Fleming's description. Thus, the favorable inference arose that it was Fleming, and the trial court failed to make such inference in the plaintiff's favor.

(a) While Fleming was an employee of defendant Justice so that it is liable for her conduct under the doctrine of respondeat superior, she was not its agent for purposes of making an admission against her employer's interest that was binding upon her employer as an exception to the hearsay rule, since she, herself, was not a defendant. OCGA §§ 24-3-33; 10-6-64; *Uniflex Corp. v. Saxon*, 198 Ga. App. 445 (402 SE2d 67) (1991); *Southern R. Co. v. Allen*, 118 Ga. App. 645 (165 SE2d 194) (1968). However, Fleming's statement was made against her penal interest and constituted a well-recognized exception to the hearsay rule, the res gestae exception, if made at the time of the occurrence or contemporaneous with it as an excited utterance. *Sutton v. Winn Dixie Stores*, 233 Ga. App. 424, 426 (504 SE2d 245) (1998); *Quiktrip Corp. v. Childs*, 220 Ga. App. 463, 465-466 (3) (469 SE2d 763) (1996); *Brown v. Piggly Wiggly Southern*, 210 Ga. App. 459, 460 (436 SE2d 513) (1993). Declarations made so nearly connected with an occurrence that are deemed free from all suspicion of device or afterthought constitute a part of the res gestae and shall be admissible in evidence. However in this case, while 25 minutes after

the occurrence has often been held to be sufficiently close to be a part of the res gestae under other circumstances, such length of time is not sufficiently close to be considered as contemporaneous with the occurrence when made by an agent, not as an excited utterance, and made to someone inquiring into the incident or investigating. OCGA §§ 24-3-3; 10-6-64; *Hassell v. First Nat. Bank &c.*, 218 Ga. App. 231, 234 (2) (461 SE2d 245) (1995); *Uniflex Corp. v. Saxon*, supra at 446; *Southern R. Co. v. Allen*, supra at 646-647; *Augusta Coach Co. v. Lee*, 115 Ga. App. 511, 514-517 (154 SE2d 689) (1967); *Allgood v. Dalton Brick &c. Corp.*, 81 Ga. App. 189, 191-192 (2) (58 SE2d 522) (1950).

Therefore, the testimony of Etheridge relating the statement made by Fleming shortly after the occurrence was hearsay and could not come into evidence under such res gestae exception.

(b) However, Fleming's testimony was submitted for the trial court's consideration in support of the motion for summary judgment by Justice, and Fleming denied negligently causing the water to be on the floor in her deposition. Therefore, Etheridge's testimony that Fleming told her that Fleming had caused the water to be on the floor constituted a prior inconsistent statement that was admissible not only to impeach Fleming, but also as probative evidence in the case as to who caused the water to be on the floor. OCGA § 24-9-83; *Woodard v. State*, 269 Ga. 317, 318-319 (2) (496 SE2d 896) (1998); *Sprouse v. State*, 250 Ga. 174, 176 (296 SE2d 584) (1982); *Gibbons v. State*, 248 Ga. 858, 862-863 (286 SE2d 717) (1982). Thus, such testimony was admissible both for impeachment of Fleming, which would create a jury question as to credibility, but also as substantive evidence in the case, which would cause a material conflict in the evidence, requiring denial of the motion. When a witness testifies under oath and is subject to cross-examination, a prior inconsistent statement is not hearsay and is admissible substantive evidence. *Sprouse v. State*, supra at 176.

(c) Further, favorable reasonable inferences as to Justice's liability can be drawn from the evidence. Fleming testified that she saw no water on the floor when she entered the laundry room and did not look at the floor while she was there; therefore, the reasonable inference arises that any water on the floor came from her transfer of the wet clothes from the washer to the dryer when she shook them out over the floor, which she admitted doing. This inference must be drawn in favor of the plaintiff, which then created a material issue of fact that Fleming, as an employee of Justice, caused water to be on the floor. This conflicts with Fleming's sworn testimony to the contrary and creates a material issue of fact for jury determination, as well as to evidence of negligence. See OCGA § 9-11-56 (e).

All evidence must be construed most favorably for the respondent on a motion for summary judgment, and all inferences that may

fairly and reasonably be drawn in support of her case must be made in her favor by the trial court. *Eiberger v. West*, 247 Ga. 767, 769 (1) (281 SE2d 148) (1981); *Mitchell v. Rainey*, 187 Ga. App. 510, 512-513 (370 SE2d 673) (1988); *McCarty v. Nat. Life &c. Ins. Co.*, 107 Ga. App. 178, 179 (129 SE2d 408) (1962).

Where more than one inference can be drawn from circumstantial evidence as to a material element of plaintiff's case, a trial judge cannot make the determination as to which inference to accept, because the inference most favorable to the respondent must be drawn as a matter of law; only a trial jury can determine between competing reasonable inferences, which inference to make from the evidence before them. *McCarty v. Nat. Life &c. Ins. Co.*, supra at 178.

Where the plaintiff has responded to a motion for summary judgment by presenting circumstantial evidence that gives rise to a reasonable inference that a breach of duty of ordinary care occurred, summary judgment must be denied, because the trial judge must draw such inference as a matter of law. *Lau's Corp. v. Haskins*, supra at 491; *Merritt v. Athens Clarke County*, 233 Ga. App. 203, 208 (3) (504 SE2d 41) (1998).

### Case No. A01A0067

Plaintiff as the servant/invitee of a tenant, Etheridge, comes within the landlord-tenant relationship. OCGA § 44-7-14; *Spence v. C & S Nat. Bank*, 195 Ga. App. 294, 295 (1) (393 SE2d 1) (1990). However, where the injury arises from a common area, the landlord's liability to the tenant and the tenant's invitee arises under OCGA § 51-3-1 and not under OCGA § 44-7-14, so that the landlord has the duty of keeping the common areas safe through the exercise of ordinary care at all times. *Commerce Properties v. Linthicum*, 209 Ga. App. 853, 854 (2) (434 SE2d 769) (1993). Being an invitee arising out of a landlord-tenant relationship means that the landlord must foresee the invitee's presence in the common areas at all times and exercise the requisite reasonable care to keep such areas safe. See *Paul v. Sharpe*, 181 Ga. App. 443, 444-445 (1) (352 SE2d 626) (1987).

Where the tortious conduct of a third party should reasonably be foreseen by prior similar conduct putting the owner on notice of the risk of danger to invitees from such third party's conduct, the owner has the duty to anticipate a tortious act of a third party and to exercise ordinary care to protect invitees from such danger, because from its superior knowledge of the danger caused by prior third party's tortious misconduct, the owner must anticipate a repetition of such conduct under the facts and circumstances to protect the invitee. Foreseeability gives rise to the duty to act. *Days Inns of America v. Matt*, 265 Ga. 235 (454 SE2d 507) (1995); *Lau's Corp. v. Haskins*,

supra at 492-493 (1); *McNeal v. Days Inn of America*, 230 Ga. App. 786, 788 (498 SE2d 294) (1998).

Further, the Authority knew that users were causing water to get on the floor through use of the laundry room in various ways; therefore, the third party's tortious misconduct would not constitute a supervening cause but be a concurrent proximate cause of plaintiff's injuries. See *Taylor v. Atlanta Gas Light Co.*, 93 Ga. App. 766, 769-770 (92 SE2d 709) (1956). In attempting to address this danger of water on the floor, the Authority cut off the water to the laundry room sinks; kept mops in the laundry rooms for the users to get up the water that they spilled; gave warnings; and maintained floor drains. These measures evidenced a knowledge, awareness, and appreciation of the risk of danger to the elderly and disabled invitees. However, an issue arises for jury determination as to whether the Authority negligently failed to take sufficient measures to remove the danger, since the Authority failed to stop water getting on the floors by putting out rubber mats, grooving the floor to drain water quicker, and making the floor slip resistant through a rough surface. Also, the Authority was aware that some users carried water to the laundry room to fill up the new washers, which was active negligence that the Authority had a duty to prevent from recurring.

The law has long been that when conditions make the premises unusually dangerous, the owner has a duty to continuously patrol the floors; absent such conditions making the premises dangerous, the law does not require such constant patrols. *Boatright v. Rich's, Inc.*, 121 Ga. App. 121 (173 SE2d 232) (1970); see also *Alterman Foods v. Ligon*, 246 Ga. 620, 622 (272 SE2d 327) (1980); *Anderson v. Svc. Merchandise Co.*, 230 Ga. App. 551 (496 SE2d 743) (1998); *Fussell v. Jimbo's Log Kitchen*, 227 Ga. App. 161 (489 SE2d 71) (1997). When undertaking the duty to keep the premises safe by the exercise of ordinary care, this includes inspecting the premises to discover anticipated dangerous conditions about which the owner does not have actual knowledge and taking reasonable precautions to protect invitees from dangers foreseeable from the use of the premises. OCGA § 51-3-1; *Robinson v. Kroger Co.*, 268 Ga. 735, 740 (1) (493 SE2d 403) (1997); *Freyer v. Silver*, 234 Ga. App. 243, 246 (2) (507 SE2d 7) (1998). Therefore, the owner of the premises is on constructive notice of what a reasonable inspection would reveal. See *Jackson v. Waffle House*, 245 Ga. App. 371 (537 SE2d 188) (2000); *Wesleyan College v. Weber*, 238 Ga. App. 90, 94 (b) (517 SE2d 813) (1999); *Freyer v. Silver*, supra at 245-246 (2).

Fleming testified that the coin-operated washing machines did not fill to the normal water level, which prevented a full load of clothing from being washed. She denied filling the washer with water, but testified that some other residents poured more water into the

washer to allow a full load to be washed. The Authority claimed that the new washing machines held the same amount of water as the old machines; that the machines did not work with excess water; and that the new washers looked to the users as if they held less water. The laundry rooms had sinks, but the Authority cut off the water there to prevent washer users from getting additional water to fill the washers. The Authority was aware prior to plaintiff's fall that this practice was occurring on the fifth floor, but did not specifically know for certain that it was also occurring on the third floor, although its employee heard rumors to that effect. In response, the Authority cut off the water in the sink on the third floor and placed mops in the laundry room so that any spilled water could be gotten up immediately by any user. The Authority claimed to have posted a warning not to add water to the new washing machines, but the sign did not stay up; the Authority warned in the newsletter, "Highlight," that no one should put water into the washers; however, Carl Ware from building maintenance denied that any warnings had been posted. Thus, the Authority had actual knowledge of the dangerous condition, even though it had no actual knowledge of the presence of water on this occasion. The Authority had constructive knowledge of the dangerous practice of third persons.

The inspection schedule of the laundry room consisted of at least one inspection each day when the trash was removed. Maintenance men would go each morning into the laundry room to empty the trash can, check the room, and clean it up as necessary. However, Henderson Reeves from building maintenance claimed that he inspected the laundry rooms every hour or hour and a half throughout the day, or at least every two hours, and did so on the day of the occurrence. Ware did not know when or if Reeves inspected each laundry room, but Ware did not inspect them himself.

Retha Jones of the Authority denied that the Authority had any problems with people filling up washing machines and getting water on the floor, although she admitted to hearing rumors about these problems. The Authority expected that water would get on the floor from wet clothes being transferred from the washer to the dryer. The Authority did not treat such water on the floor as a problem, because users were expected to mop up the water themselves. There were no rubber mats on the floor, because any quantity of water was expected to go out the floor drain. *Robinson v. Kroger Co.*, supra at 748-749. The Authority was on notice of the foreseeable risk of water on the laundry room floor from (1) users attempting to pour more water into the new washers because the new washers looked like they held less water; and (2) water dripping from the transfer of wet clothes from the washer to the dryer. In recognition of the danger of water on the laundry room floor, the Authority placed a mop for the users to use in

getting any water up immediately, made periodic inspections each day, and maintained a floor drain. The Authority did not place rubber mats on the floor; nor did it make inspections more frequently than every hour, although users constantly used the washers and increased the risk of the presence of water on the floor and the exposure of subsequent users to the danger. We cannot hold as a matter of law that the inspection schedule was reasonable or sufficient in light of the foreseeable risks to the elderly and disabled. *McConnell v. Smith &c. Mgmt. Corp.*, 233 Ga. App. 447, 449 (2) (504 SE2d 526) (1998).

Periodic inspections would be insufficient to protect the user from the risk of harm, unless done frequently, because such risk is constantly present by continuous proper use with dripping clothes and possible misuse of the washers from manual filling; whether or not inspections made at one- to two-hour intervals were sufficient is a jury question. Thus, the trial court could not hold that the inspection procedure was reasonable as a matter of law under the circumstances. *Shepard v. Winn Dixie Stores*, 241 Ga. App. 746, 748 (527 SE2d 36) (1999); *Hutchins v. J. H. Harvey Co.*, 240 Ga. App. 582, 585 (2) (524 SE2d 289) (1999); *J. H. Harvey Co. v. Reddick*, 240 Ga. App. 466, 470-471 (1) (522 SE2d 749) (1999). Whether the presence of rubber mats, a rough nonskid floor surface, or grooves in the floor to carry water to the floor drain would be necessary is a jury question as to what constitutes the exercise of ordinary care under the circumstances. *Robinson v. Kroger Co.*, supra.

Under the facts and circumstances of this case, it cannot be said as a matter of law, where the old or the disabled were reasonably expected to be exposed to such risk, that an inspection schedule every one to two hours was representative of the exercise of reasonable care. *Hartley v. Macon Bacon Tune*, 234 Ga. App. 815, 818 (507 SE2d 259) (1998). The owner must satisfy the owner's statutory duty to exercise ordinary and reasonable care under the circumstances to make the premises safe. OCGA § 51-3-1.

I am authorized to state that Judge Miller joins in this dissent.

DECIDED JULY 6, 2001 —
RECONSIDERATION DENIED JULY 31, 2001 —

*Sell & Melton, Russell M. Boston, Neil A. Halvorson*, for appellant.

*Martin, Snow, Grant & Napier, John C. Daniel III, Richard A. Epps, Jr., Hall, Booth, Smith & Slover, Heather C. McGrotty, Jason P.*

■■■■■■■■■

*King, Moore, Clarke, DuVall & Rodgers, Luanne Clarke*, for appellees.